UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-20179-BLOOM/Louis

BERNARD B. NORRIS,

    Plaintiff,

v.

ACTING SECRETARY, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
*Chad Wolf*,

    Defendant.
_____/

## ORDER ON MOTION TO DISMISS AMENDED COMPLAINT

**THIS CAUSE** is before the Court upon Defendant, Chad Wolf, Acting Secretary, United States Department of Homeland Security's ("Defendant" or "DHS") Motion to Dismiss Plaintiff's Amended Complaint, ECF No. [8] ("Motion"). Plaintiff Bernard B. Norris ("Plaintiff" or "Norris") filed a Response, ECF No. [15] ("Response"), to which DHS filed a Reply, ECF No. [19] ("Reply"). The Court has carefully considered the Motion, the Response and Reply, the record in this case and the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is granted.

    **I.**    **BACKGROUND**

This case arises as a result of Norris's termination from his position as a police officer in the Federal Protective Service ("FPS" or "Agency") in September, 2019. Norris was previously removed by FPS in 1997, which led to his initiating a lawsuit against the General Services Administration ("GSA")[1] for discrimination and retaliation. The lawsuit resulted in a judgment in

---

[1] FPS transferred from the GSA to the DHS pursuant to the Homeland Security Act of 2002, 6 U.S.C. §§ 101, *et seq*.

his favor for damages, reinstatement, and a requirement that all documents concerning his 1997 termination and a previous suspension in 1994 be removed from his official personnel folder ("OPF"). As alleged in the Amended Complaint, ECF No. [7], Norris first began working for FPS in 1980, and was continuously working at FPS from 1989 until his removal in September, 2019.

In the late 1970s, Norris was a licensed private investigator in Miami. While working as a security manager in Hialeah, he became aware of a plot to sell large numbers of illegal assault weapons and assassination kits to kill federal officials. He volunteered to assist the United States Attorney's Office ("USAO") in Miami by providing testimony on behalf of the government in a criminal case, which resulted in the convictions of two individuals for violation of 18 U.S.C. § 371.

As a result of his cooperation and testimony, he was placed in the federal witness protection program, which he and his family left after a little over a year. Norris and his then wife were both hired by FPS in 1980, with recommendations from the USAO, and after passing extensive background investigations. Nevertheless, rumors arose within FPS and other law enforcement agencies about Norris's participation in the criminal case and the witness protection program. In 1994, Norris was suspended for two weeks for alleged misconduct based on allegations by Miami Zone Commander Donald Williamson ("Williamson"). Norris was removed from his employment with FPS on July 24, 1997. Thereafter, he filed the lawsuit against GSA, raising claims for national origin discrimination and retaliation. Following a jury trial before District Judge Ungaro, judgment was entered in Norris's favor, and he was reinstated to his position as a Supervisory Police officer with FPS.

While Norris was terminated, Special Agent Emilio Hernandez ("Hernandez") was hired by FPS and was supervised by Williamson. According to Norris, Hernandez and Williamson became friends and Williamson told Hernandez that he believed Norris was a former member of a

drug cartel who had testified for the government and then assumed a new identity in witness protection, which identity he used to infiltrate FPS before he was properly removed for criminal conduct in 1997. When Norris was reinstated to his position following the lawsuit, he was placed under Williamson's supervision. Norris concedes that Williamson refrained from further discriminating against him, but Williamson nevertheless openly expressed his disagreement with the resolution of the lawsuit and Norris's reinstatement, and allegedly mocked the result as a technicality.

Upon Norris's reinstatement, Hernandez allegedly requested transfer to a position as an instructor at the Federal Law Enforcement Training Center ("FLETC") in Georgia because he did not want to work with Norris. Nevertheless, Norris attended a DHS training course at FLETC, where Hernandez told Norris that he was aware of Norris's time in witness protection. Hernandez accused Norris of being a criminal who was a disgrace to the badge and should be terminated. Hernandez also said that Norris won his lawsuit on a technicality and advised Norris that although he may have "won the battle," that he would "lose the war" because Hernandez had resources that would ensure that Norris was permanently removed from federal employment.

In 2007, Hernandez was assigned to FPS Internal Affairs. According to Norris, although Hernandez remained based in Georgia, he would travel on occasion to Miami. Hernandez would openly express his disagreement with the result of Norris's lawsuit. Hernandez complained that Norris won on a technicality, and insisted that Norris was unfit for federal employment because he was a criminal when he testified for the government and entered the witness protection program in the 1980s.

In November, 2012, Hernandez was assigned to investigate a complaint by Norris's ex-wife that Norris made threatening comments to her during a training exercise. In addition to the

administrative inquiry, a criminal investigation was opened for the same incident, which was also assigned to Hernandez. According to Norris, Hernandez expanded the investigation beyond the workplace issues in attempts to discredit him and have him removed. On January 5, 2013, Hernandez presented the case against Norris for prosecution, but it was declined by the Assistant United States Attorney. In February, 2013, Hernandez interviewed Norris in connection with the administrative investigation, and repeated his belief that Norris won the lawsuit on a technicality and that Norris was a disgrace to the badge. He also allegedly demanded that Norris provide him with evidence that supported his claims in the lawsuit and repeated his threat to ensure that Norris "lost the war."

As a result of Hernandez's investigation, he recommended to Richard Sellerds ("Sellerds"), the new FPS Regional Director, that Norris be removed. On April 26, 2013, Sellerds proposed a 14-day suspension, which Norris served in June, 2013. Sellerds apparently informed Norris following the suspension that Hernandez had shared information with him about Norris's involvement in the witness protection program and claimed that Norris was engaging in criminal activities before and after his reinstatement. Sellerds told Hernandez that he knew the information about Norris's criminal background was false and that Norris won his lawsuit because he was subjected to discrimination.

In October, 2015, Sellerds was replaced as Regional Director by Mario Morales ("Morales"), who had no knowledge of Norris's employment or disciplinary history. At the time, there were no pending administrative inquiries involving Norris. Sometime in 2016 or 2017, Hernandez requested a private meeting with Morales to share information about Norris, during which Hernandez shared a dossier comprising over 300 pages that he had compiled on Norris.

Morales accepted the dossier, reviewed the information contained in it, and kept the file in his office without having it marked, identified, or entered into the Agency records system.

In December, 2016, Norris learned that over two years earlier, his two teenaged stepdaughters had made allegations of sexual misconduct against him. In accordance with DHS policy, Norris disclosed the issue to Area Commander Joseph Cuciti ("Cuciti") and Morales. FPS policies required that Norris be relieved of his gun, badge, uniform and credentials as a result of the nature of the allegations, and that he be restricted to administrative duties while being investigated by the Agency. The charges were dropped shortly thereafter and Norris was informed that the Miami Police were recommending that no action be taken by the State Attorney's Office. Morales restored Norris's law enforcement authority at the end of January, 2017.

Two days later, Morales reversed his decision and decided to keep Norris on non-law enforcement administrative duties. Norris contends that Morales's decision violated Agency policy, since Norris was no longer the subject of criminal investigation or charges. Nevertheless, Norris remained on administrative assignment until he was finally cleared in December, 2017.

On February 15, 2018, Norris was again suspended from law enforcement activities due to allegations that he failed to pay for furniture leased from a local business, which resulted in a police report for grand larceny filed with the Hialeah police. Within a week, Norris paid the disputed debt and the criminal complaint was dismissed. In addition, in June, 2017, a complaint was filed alleging that Cuciti was violating Morales's orders by allowing Norris to ride in an official vehicle and perform law enforcement-type functions. The FPS administrative investigations concluded on September 5, 2018, but Morales kept Norris restricted to administrative duties until he was finally removed from FPS employment on September 10, 2019.

In March, 2019, Aaron Godbey ("Godbey") became Florida District Commander for FPS, and was advised to take action regarding Norris. Morales met with Godbey in March or April, 2019 to discuss pending administrative actions and "rumors" about various employees working under Godbey's supervision. Morales told Godbey about Norris's involvement in witness protection and claimed that Norris was involved in illegal drug and weapons activity on behalf of cartels. While Godbey worked on the proposal to remove Norris, Morales told Deputy Regional Director Shirley Reed ("Reed") that he was in possession of documentation related to Norris and he provided Reed with a copy of Hernandez's dossier on Norris.

Norris received a notice of proposed removal and supporting materials from Godbey on July 23, 2019. The proposal was based on four charges, including lack of candor, failure to follow instructions, conduct unbecoming a law enforcement officer, and willful misuse of a government-owned vehicle. Reed did not disclose her conversations with Morales or that she was in possession of additional documents, despite issuing a notice of "Additional Documentation Regarding Notice of Proposed Removal." Reed issued her decision removing Norris from federal employment on September 9, 2019. Although Godbey denied any conversation with Reed about Norris's background before the removal decision, he did recall that Reed told him about Norris's alleged cartel activities after she made the removal decision.

Norris appealed the removal decision to the Merit Systems Protection Board ("MSPB") on September 13, 2019, during which the Agency produced a copy of Hernandez's dossier that he gave Morales. As a result, Norris contends that his removal was not supported by a preponderance of the evidence and that there were no legitimate, non-retaliatory reasons for the removal.

Therefore, Norris asserts two claims against DHS, for retaliation in violation of 42 U.S.C. § 2000e-16 ("Title VII") (Count 1), and violation of the final judgment entered in his previous

lawsuit (Count 2) arising from DHS's retention of copies of the disciplinary actions in unofficial files maintained by certain individuals at FPS.

## II. LEGAL STANDARD

Rule 8 of the Federal Rules requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requests dismissal for failure to state a claim upon which relief can be granted.

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). A court considering a Rule 12(b) motion is generally limited

to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *see also Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

### III. DISCUSSION

In the Motion, Defendant argues that the Amended Complaint should be dismissed because Plaintiff failed to exhaust his administrative remedies, Plaintiff fails to allege sufficient facts to establish a causal relationship between his 1998 lawsuit and his removal in 2019, and his claim for failure to comply with the final judgment in the 1998 lawsuit is improper and meritless. Necessary to the Court's ultimate determination is an understanding of the procedural posture in this case. As set forth in the Motion, which Plaintiff does not dispute, the relevant facts are set forth below.[2]

Plaintiff filed an appeal of his removal with the MSPB on September 13, 2019. On October 25, 2019, the parties attended a pre-hearing teleconference with the MSPB Administrative Law Judge ("ALJ") to discuss scheduling. The ALJ scheduled the hearing for January 7, 2020, and issued an order that suspended case processing for thirty (30) days beginning October 25, 2019 to allow the parties to complete discovery. The appeal processing resumed on November 24, 2019, and the ALJ conducted an evidentiary hearing on the merits of Plaintiff's appeal on January 7 and 8, 2020.

---

[2] Plaintiff specifically states in his Response that "he adopts the 'Background and Procedural History' at pages three to six of Defendant's Motion to Dismiss, which accurately outlines the procedural history of this case and the MSPB proceedings that occurred before and after this lawsuit was filed." ECF No. [15] at 2.

On January 15, 2020, before receiving a decision from the ALJ, Plaintiff filed the Complaint initiating this case, *see* ECF No. [1], raising the same claims that were pending in the MSPB appeal, including the alleged violation of anti-retaliation provisions of Title VII. In addition, on January 24, 2020, Plaintiff withdrew his Title VII reprisal claim from the MSPB appeal, and on January 27, 2020, filed the Amended Complaint in this case. On March 19, 2020, the ALJ issued an initial decision sustaining the Agency's decision to remove Plaintiff., but because Plaintiff had withdrawn his Title VII retaliation claim from the MSPB appeal, the ALJ did not rule on that claim.

### A. Plaintiff failed to exhaust his administrative remedies

"A federal employee must pursue and exhaust her administrative remedies as a jurisdictional prerequisite to filing a Title VII . . . action." *Brady v. Postmaster Gen., U.S. Postal Serv.*, 521 F. App'x 914, 916 (11th Cir. 2013) (citing *Shiver v. Chertoff,* 549 F.3d 1342, 1344 (11th Cir. 2008)). The purpose of exhaustion is "to give the agency the information it needs to investigate and resolve the dispute." *Wade v. Sec'y of the Army*, 796 F.2d 1369, 1377 (11th Cir. 1986). When an federal employee claims to have been affected by an adverse employment action motivated by discrimination, known as a "mixed-case," the employee can choose between filing a mixed-case with the agency's Equal Employment Office ("EEO"), or filing a mixed-case appeal with the MSPB. 5 U.S.C. § 7702(b). In other words, a federal employee who alleges employment discrimination related to or arising from "an appealable agency action" presents a "mixed case appeal." 29 C.F.R. § 1614.302(a)(2). In a mixed case appeal, a final decision from the MSPB exhausts an employee's administrative remedies and allows the employee to seek judicial review. *Chappell v. Chao*, 388 F.3d 1373, 1375 (11th Cir. 2004). In addition, if the MSPB fails to take a

judicially reviewable action within 120 days of filing of an appeal, the employee may also seek judicial review. *See* 5 U.S.C. § 7702(e)(1)(B).[3]

Here, Defendant argues that Plaintiff has failed to exhaust his administrative remedies pursuant to 5 U.S.C. § 7702(e) because the applicable 120-day clock was paused for thirty days when the ALJ suspended processing of this case. In addition, because Plaintiff withdrew his retaliation claims from the MSPB appeal before the expiration of 120 days, Plaintiff has forfeited his opportunity to assert a retaliation claim before this Court. In response, Plaintiff characterizes the ALJ's ability to suspend case processing as a "case management" regulation, which could not possibly toll Plaintiff's appeal rights, and there is no evidence that Plaintiff engaged in any actions to delay or avoid the MSPB proceeding, or that he abandoned his Title VII claim prematurely.

According to the relevant regulations, the ALJ is to decide both the issue of discrimination and the appealable agency action within 120 days after the appeal is filed. 5 C.F.R. § 1201.156. Even so, "[t]he judge may issue an order suspending the processing of an appeal for up to 30 days." 5 C.F.R. § 1201.28(a). The ability to suspend was introduced to address concerns regarding time to conduct discovery and engage in settlement. *See* Practices and Procedures, 67 Fed. Reg. 3,811-01 (Jan. 28, 2002). The relevant background and stated purpose of the new regulation are as follows:

> In November 1999, the Merit Systems Protection Board (MSPB) established a pilot project to allow employee-appellants and agencies up to 60 days additional time to pursue discovery and settlement efforts in pending initial appeals. The pilot program was initiated, in part, in response to concerns raised by Board practitioners that the 120-day time limit for adjudicating appeals prevented the parties from conducting the discovery they believed necessary to prevail on appeal. The pilot simplified the process for obtaining a suspension of case processing to accommodate parties before the Board.

---

[3] 5 U.S.C. § 7702(e)(1)(B) states that "[n]otwithstanding any other provision of law, if at any time after— the 120th day following the filing of an appeal with the Board . . . there is no judicially reviewable action . . ., an employee shall be entitled to file a civil action to the same extent and in the same manner as provided in section 717(c) of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16(c)) . . . ."

10

> Under the pilot, the presiding judge was authorized to grant a 30-day suspension of case processing to parties who mutually requested the additional time. A second 30-day suspension was granted if the parties agreed that further time was necessary. Parties were not required to provide evidence and argument to support a joint request for additional time, so long as the request was made early in the proceedings.
>
> The Board believes that the pilot has been successful in addressing the concerns regarding adequate time to conduct discovery and in facilitating settlement of complex cases.

*Id*. Thus, the purpose of the regulation is precisely to allow an ALJ, in appropriate cases, to freeze the 120-day statutory time period for up to sixty days to allow the parties to conduct necessary discovery and/or facilitate settlement. Although Plaintiff disagrees with such an interpretation, he has not pointed to any authority to support his position. Indeed, interpreting the thirty-day suspension as anything other than an effective tolling of the 120-day statutory timeframe would negate the purpose of the regulation. *Cf. Williamson v. M.S.P.B.*, 334 F.3d 1058, 1062-63 (Fed. Cir. 2003) (stating that § 1201.28(a) gave the ALJ no discretion to deny request for more time and ALJ was required to suspend processing of the case in finding that dismissal as untimely prior to expiration of thirty-day suspension was error).

In this case, Plaintiff has agreed with Defendant's characterization of the relevant background and procedural history. Plaintiff filed his appeal on September 13, 2019. Thus, had the ALJ not issued an order suspending case processing, the 120 days would have expired on January 11, 2020. However, the ALJ issued an order suspending processing for thirty days effective October 25, 2019, with processing resuming on November 24, 2019. As a result, the 120 days did not expire in Plaintiff's appeal, and thus Plaintiff could not file suit in this Court, until February 10, 2020. Accordingly, when Plaintiff filed the Complaint in this case on January 15,

11

2020, and then the Amended Complaint on January 27, 2020, the 120 days had not yet expired. As such, this case is premature.

The Court's analysis, however, does not end there. Further complicating this case is the fact that Plaintiff withdrew the retaliation claim from the MSPB's consideration in his appeal on January 24, 2020, also before the expiration of 120 days. Defendant contends that, as a result of the withdrawal, Plaintiff has failed to exhaust his administrative remedies with respect to the retaliation claim and has forfeited the right to raise it here. Plaintiff has not responded directly to this argument. Importantly, Plaintiff does not dispute that he withdrew his retaliation claim from his appeal, nor does he dispute that, as a result of the withdrawal, the MSPB's decision did not contain a ruling on the claim. As such, upon review, the Court agrees that Plaintiff cannot assert his retaliation claim here.

In the absence of expiration of 120 days, a court has jurisdiction to review only a final order or decision of the MSPB. *See* 5 U.S.C. § 7703(a)(1) ("Any employee or applicant for employment adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board may obtain judicial review of the order or decision."). "Congress did not direct or contemplate bifurcated review of any mixed case. Rather, § 7702 reflects the statement in the legislative history: 'In such cases, questions of the employee's inefficiency or misconduct, and discrimination by the employer, will be two sides of the same question and must be considered together.'" *Williams v. Dep't of Army*, 715 F.2d 1485, 1490 (Fed. Cir. 1983) (citation omitted). In addition, "it necessarily follows from this statutory scheme that a federal employee who wants to preserve both discrimination and non-discrimination claims after a final order from the MSPB *must* do so by bringing all his related claims in federal district court." *Chappell*, 388 F.3d at 1378 (emphasis in original).

It is evident from the record that Plaintiff failed to exhaust his administrative remedies in his appeal before the MSPB with respect to the retaliation claim. That is because he withdrew the claim before the ALJ had occasion to consider the merits of the claim. A final decision on the merits is required to confer jurisdiction in this Court. Plaintiff withdrew his claim and filed suit in this Court, frustrating the administrative process. Indeed, the ALJ did not issue a judicially reviewable decision on his retaliation claim only because Plaintiff withdrew the claim, which does not entitle him to district court review. As such, this Court lacks jurisdiction over Plaintiff's retaliation claim. *See McAdams v. Reno*, 64 F.3d 1137, 1142 (8th Cir. 1995) (finding that when plaintiff abandoned her Title VII claims before the MSPB, she could not assert them in a separate civil action because the statutory scheme did not confer jurisdiction to the federal court over such claims); *Harms v. Snow*, 57 F. App'x 720, 720 (8th Cir. 2003) (finding that plaintiff was precluded from raising, in a civil action, claims he abandoned before the MSPB); *Smalley v. Holder*, No. 09-21253-CIV, 2010 WL 3719288, at *4 (S.D. Fla. Sept. 21, 2010) (finding that the MSPB did not issue a judicially reviewable decision entitling plaintiff to district court review, when plaintiff voluntarily dismissed administrative appeal).

Because the Court finds that jurisdiction is lacking over Plaintiff's retaliation claim, the Court does not reach Defendant's remaining substantive arguments.

### B.  Plaintiff's "non-compliance with final judgment" claim is improper

In Count 2 of the Amended Complaint, Plaintiff seeks relief for Defendant's alleged non-compliance with the terms of the final judgment entered by Judge Ungaro in his previous lawsuit. Defendant argues that Plaintiff cannot seek relief for an alleged violation of the previous judgment through this case because there is no recognized cause of action for the relief Plaintiff seeks, and in any event, Judge Ungaro retains jurisdiction to enforce compliance with the judgment. In

response, Plaintiff "has no objection to transferring the breach of final judgment claim . . . to Judge Ungaro in accordance with Internal Operating Procedure 2.15.00." *See* ECF No. [15] at 14.

Upon review, the Court agrees that Plaintiff's claim asserted in Count 2 is improper before this Court. A federal court has inherent power to enforce its judgments. *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). However, the Court does not believe that transfer pursuant to its Internal Operating Procedures is appropriate. Therefore, if Plaintiff believes that a violation of the judgment entered by Judge Ungaro has occurred, then Plaintiff should present that claim to Judge Ungaro by way of a motion to enforce the previous judgment, and not attempt to assert it as an independent cause of action before this Court.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [8]**, is **GRANTED**, and the Amended Complaint, ECF No. [7], is **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 29, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record