UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-20179-BLOOM/Louis

BERNARD B. NORRIS,

    Plaintiff,

v.

ACTING SECRETARY, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
*Chad Wolf*,

    Defendant.
_____/

## ORDER ON MOTION TO DISMISS SECOND AMENDED COMPLAINT

**THIS CAUSE** is before the Court upon Defendant, Chad Wolf, Acting Secretary, United States Department of Homeland Security's ("Defendant" or "DHS") Motion to Dismiss Second Amended Complaint, ECF No. [33] ("Motion"). Plaintiff Bernard B. Norris ("Plaintiff" or "Norris") filed a response, ECF No. [42] ("Response"), to which DHS filed a reply, ECF No. [43] ("Reply"). The Court has carefully considered the Motion, the Response and Reply, the record in this case and the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is denied.

    **I.**    **BACKGROUND**

This case arises as a result of Norris's termination from his position as a police officer in the Federal Protective Service ("FPS" or "Agency") in September, 2019. The underlying facts remain essentially unchanged from the facts alleged in Plaintiff's Amended Complaint. The Court will nevertheless repeat them here.

Norris was previously removed by FPS in 1997, which led to his initiating a lawsuit against the General Services Administration ("GSA")[1] for discrimination and retaliation. The lawsuit resulted in a judgment in his favor for damages, reinstatement, and a requirement that all documents concerning his 1997 termination and a previous suspension in 1994 be removed from his official personnel folder ("OPF"). Norris asserts in the instant case that his protected activity in the 1998 lawsuit was a motivating factor in his ultimate removal from federal employment in 2019.

As alleged in the Second Amended Complaint, ECF No. [31], Norris first began working for FPS in 1980, and was continuously working for FPS from 1989 until his removal in September, 2019. In the late 1970s, Norris was a licensed private investigator in Miami. While working as a security manager in Hialeah, he became aware of a plot to sell large numbers of illegal assault weapons and assassination kits to kill federal officials. He volunteered to assist the United States Attorney's Office ("USAO") in Miami by providing testimony on behalf of the government in a criminal case, which resulted in the convictions of two individuals for violation of 18 U.S.C. § 371.

As a result of his cooperation and testimony, Norris was placed in the federal witness protection program, which he and his family left after a little over a year. Norris and his then (now ex-) wife were both hired by FPS in 1980, with recommendations from the USAO, and after passing extensive background investigations. Nevertheless, rumors arose within FPS and other law enforcement agencies about Norris's participation in the criminal case and the witness protection program. In 1994, Norris was suspended for two weeks for alleged misconduct based on allegations by Miami Zone Commander Donald Williamson ("Williamson"). Norris was removed from his employment with FPS on July 24, 1997. Thereafter, he filed the lawsuit against GSA,

---

[1] FPS transferred from the GSA to the DHS pursuant to the Homeland Security Act of 2002, 6 U.S.C. §§ 101, *et seq*.

raising claims for national origin discrimination and retaliation. Following a jury trial before United States District Judge Ursula Ungaro, judgment was entered in Norris's favor, and he was thereafter reinstated to his position as a Supervisory Police officer with FPS.

While Norris was terminated, Special Agent Emilio Hernandez ("Hernandez") was hired by FPS and was supervised by Williamson. According to Norris, Hernandez and Williamson became friends, and Williamson told Hernandez that he believed Norris was a former member of a drug cartel who had testified for the government. Norris then assumed a new identity in witness protection, which identity he used to infiltrate FPS before he was properly removed for criminal conduct in 1997. When Norris was reinstated to his position following the 1998 lawsuit, he was placed under Williamson's supervision. Norris concedes that Williamson refrained from further discriminating against him, but Williamson nevertheless openly expressed his disagreement with the resolution of the lawsuit and Norris's reinstatement and allegedly mocked the result as a technicality.

Hernandez left the Agency to work at the Department of Education in 2000, before returning to FPS as an instructor at the Federal Law Enforcement Training Center ("FLETC") in Georgia. As an instructor at FLETC, Hernandez conducted the periodic law enforcement refresher courses for most FPS Region IV employees. Those employess included Norris and his fellow officers in Miami. Norris attended a DHS training course at FLETC, where Hernandez told Norris that he was aware of Norris's time in witness protection. Hernandez accused Norris of being a criminal who was a disgrace to the badge and who should be terminated. Hernandez also said that Norris won his 1998 lawsuit on a technicality and advised Norris that although he may have "won the battle," that he would "lose the war," because Hernandez had "resources" that would ensure that Norris was permanently removed from federal employment.

In 2007, Hernandez became a Special Agent assigned to FPS Internal Affairs, tasked with investigating criminal and administrative matters against FPS employees. According to Norris, although Hernandez remained based in Georgia, he would travel on occasion to Miami. Hernandez would openly express his disagreement with the result of Norris's lawsuit, complaining that Norris won on a technicality. Hernandez insisted that Norris was unfit for federal employment because he was a criminal when he testified for the government and entered the witness protection program in the 1980s.

In November, 2012, Hernandez was assigned to investigate a complaint by Norris's ex-wife that Norris made threatening comments to her during a training exercise. In addition to the administrative inquiry, a criminal investigation was opened for the same incident, which was also assigned to Hernandez. According to Norris, Hernandez expanded the investigation beyond the workplace issues to discredit him and have him removed. For example, Hernandez allegedly contacted a woman with whom Norris had had a romantic relationship and falsely represented to her that he was investigating Norris for theft of computer equipment from the government. Based on his interview with the woman, Hernandez recommended that Norris be charged with associating with illegal aliens and understating the value of a vehicle in order to avoid paying full sales tax under Florida law. When Hernandez attempted to interview Norris, Norris declined to be interviewed without counsel but allowed Hernandez to search his office.

On January 5, 2013, Hernandez presented the case against Norris for prosecution, but it was declined by the Assistant United States Attorney in lieu of administrative action. In February, 2013, Hernandez interviewed Norris in connection with the administrative investigation. Hernandez repeated his belief that Norris won the lawsuit on a technicality and was a disgrace to the badge by continuing to engage in criminal activities following reinstatement. Hernandez also

allegedly demanded that Norris provide him with evidence that supported his claims in the lawsuit, and repeated his threat to ensure that Norris "lost the war."

Following Hernandez's investigation, he recommended to Richard Sellerds ("Sellerds"), the new FPS Regional Director, that Norris be removed. On April 26, 2013, Sellerds proposed a 14-day suspension, which Norris served in June, 2013. Sellerds apparently informed Norris later that Hernandez had shared information with him about Norris's involvement in the witness protection program and claimed that Norris was engaging in criminal activities before and after his reinstatement. Sellerds apparently told Hernandez that he knew the information about Norris's criminal background was false and that Norris won his lawsuit because Norris had been subjected to discrimination.

In October, 2015, Sellerds was replaced as Regional Director by Mario Morales ("Morales"), who had no knowledge of Norris's employment or disciplinary history, and at the time, there were no pending administrative inquiries involving Norris. Sometime in 2016 or 2017, Hernandez requested a private meeting with Morales to share information about Norris, during which Hernandez shared a dossier comprising over 300 pages that he had compiled on Norris. Among the documents in Hernandez's file where documents confirming Norris's participation as a government witness, copies of disciplinary actions against him—which should have been removed from his personnel file following the 1998 lawsuit, and photographs of Norris that Hernandez misrepresented to be proof of Norris's continuing to engage in criminal activity. Morales accepted the file from Hernandez, reviewed it, and kept it in his office without having it marked or identified pursuant to Agency policy or entered into Agency records. Morales did not request or review any of the records of the investigations of Norris, and simply assumed that the information and allegations contained in Hernandez's file on Norris was true.

In December, 2016, Norris learned that over two years earlier, his two teenaged stepdaughters had made allegations of sexual misconduct against him. In accordance with DHS policy, Norris disclosed the issue to Area Commander Joseph Cuciti ("Cuciti") and Morales. FPS policies required that Norris be relieved of his gun, badge, uniform and credentials as a result of the nature of the allegations, and that he be restricted to administrative duties while being investigated by the Agency. The charges were dropped shortly after, and Norris was informed that the Miami Police were recommending that no action be taken by the State Attorney's Office. Morales restored Norris's law enforcement authority at the end of January, 2017.

However, two days later, Morales reversed his decision and decided to keep Norris on non-law enforcement administrative duties under Cuciti. Norris contends that Morales's decision violated Agency policy, since Norris was no longer the subject of criminal investigation or charges. Nevertheless, Norris remained on administrative assignment until he was finally cleared in December, 2017.

On February 15, 2018, Norris was again suspended from law enforcement activities due to allegations that he failed to pay for furniture leased from a local business, which resulted in a police report for grand larceny filed with the Hialeah police. Within a week, Norris paid the disputed debt and the criminal complaint was dismissed; however, Morales kept Norris restricted to administrative duties.  The issues regarding the Miami Police case in 2017 and the leased furniture were assigned to Hernandez and Special Agent James Ricciuti for administrative investigation. The FPS administrative investigations concluded on September 5, 2018, but Morales kept Norris restricted to administrative duties until he was finally removed from FPS employment on September 10, 2019.  Norris was never informed of the status of the investigations despite his repeated inquiries.

In March, 2019, Aaron Godbey ("Godbey") became Florida District Commander for FPS. Godbey was advised to take action regarding Norris. Morales met with Godbey in March or April, 2019 to discuss pending administrative actions and "rumors" about various employees working under Godbey's supervision. Morales told Godbey about Norris's involvement in witness protection and claimed that Norris was involved in illegal drug and weapons activity on behalf of cartels. Morales also attempted to schedule a meeting with Godbey and Hernandez so that Hernandez could brief Godbey about his prior investigations and findings about Norris. The meeting did not occur.

Even so, while Godbey worked on the proposal to remove Norris, Morales told Deputy Regional Director Shirley Reed ("Reed") that Morales was in possession of documentation related to Norris, and he provided Reed with a copy of Hernandez's dossier on Norris. Norris received a notice of proposed removal and supporting materials from Godbey on July 23, 2019, based on four charges. These included lack of candor, failure to follow instructions, conduct unbecoming a law enforcement officer and willful misuse of a government-owned vehicle. After requesting the opportunity to respond to the proposed removal, Reed issued a notice of "Additional Documentation Regarding Notice of Proposed Removal" ("Notice"). Although no additional documentation was included with the Notice, Reed disclosed that she heard rumors of Norris's involvement with weapons and/or drug activity for a drug cartel, and that his employment was previously terminated as a result but that he was reinstated based on a legal technicality. Reed did not disclose her conversations with Morales or that she was in possession of the documents when she issued the Notice. Norris contends that instead, she falsely claimed that the Notice was issued after she had a conversation with Godbey, which Godbey denied. Reed issued her decision removing Norris from federal employment on September 9, 2019. Although Godbey denied any

conversation with Reed about Norris's background before the removal decision, he did recall that she told him about Norris's alleged cartel activities in Los Angeles and Miami after she made the removal decision.

Norris appealed the removal decision to the Merit Systems Protection Board ("MSPB") on September 13, 2019, during which the Agency produced a copy of Hernandez's dossier that he gave Morales. As a result, Norris contends that his removal was not supported by a preponderance of the evidence and that there were no legitimate, non-retaliatory reasons for the removal.

In the Second Amended Complaint, Norris asserts two claims against DHS, for retaliation in violation of 42 U.S.C. § 2000e-16 ("Title VII") (Count 1), and an appeal of his removal under the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 7701(c) (Count 2). In the Motion, Defendant argues that the Second Amended Complaint should be dismissed for failure to state a claim for Title VII retaliation, and the CSRA claim should be dismissed or transferred to the Federal Circuit.

## II.     LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (*quoting Twombly*, 550 U.S. at 557, 127 S. Ct. 1955 (alteration in original)). "Factual allegations must be

enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. These elements are required to survive a motion brought under Rule 12(b)(6), which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955; *see Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (*quoting Iqbal*, 556 U.S. at 682, 129 S. Ct. 1937). Through this lens, the Court considers the Motion.

**III. DISCUSSION**

Defendant argues first that Norris fails to sufficiently allege a plausible claim for Title VII retaliation because there are insufficient facts to establish a causal link between his 1998 Title VII case and his removal from FPS nearly twenty years later.

"Title VII makes it unlawful 'for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice' under Title VII." *Uppal v. Hosp. Corp. of Am.,* 482 F. App'x 394, 397 (11th Cir. 2012) (quoting 42 U.S.C. § 2000e–3(a)) (alteration omitted). "Retaliation under Title VII occurs when an employee engages in

protected activity, and suffers an adverse employment action that is causally related to that activity." *Id.* (citing *Harper v. Blockbuster Ent. Corp.,* 139 F.3d 1385, 1388 (11th Cir.1998)); *see also Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 891 (11th Cir. 2015) (citing *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012)); *Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1334 (S.D. Fla. 2012).

Defendant does not argue that the allegations are insufficient regarding the first two elements of Plaintiff's claim – protected activity and adverse employment action. Indeed, Plaintiff alleges in the Second Amended Complaint that the protected activity was his participation and prevailing in the 1998 Title VII lawsuit, and the adverse employment action was his removal from FPS employment in 2019. Rather, in the Motion, Defendant focuses on the third element of Plaintiff's claim—causation. Specifically, Defendant contends the bulk of the allegations in the Second Amended Complaint pertain to Norris's participation in the 1970s as a witness for the government, not to his prior 1998 Title VII case, and that the facts regarding his 1998 case are too few and far between to establish causation. In response, Norris contends that his claim of retaliation is not premised solely on temporal proximity to establish causation, and the allegations are sufficient to support a "cat's paw" theory of liability. Upon review, the Court agrees with Norris.

"To demonstrate a causal connection, 'a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Walker v. Sec'y, U.S. Dep't of the Air Force*, 518 F. App'x 626, 628 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecomms., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002)); *see also McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008), *cert. denied*, 129 S. Ct. 404 (2008). Under a "cat's paw" theory of liability, "a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently

investigated allegations of misconduct." *Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008). "[E]ven when the harasser in a Title VII case is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker as her 'cat's paw'—i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation, [ ] causation is established. *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (internal citation omitted). Further, "[i]n a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." *Id*. "In effect, the harasser *is* the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the harasser's discriminatory animus." *Id*. Even so,

> [w]hen the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (citing *Llampallas*, 163 F.3d at 1248).

The Second Amended Complaint alleges a sustained and concerted effort undertaken by Hernandez to have Norris permanently removed from federal employment based on his friendship with Williamson, who was primarily responsible for initiating the disciplinary actions that supported Norris's removal prior to the 1998 Title VII lawsuit—an effort that began from the time of Norris's 1998 Title VII lawsuit until Norris's ultimate removal in 2019. Even though Hernandez was not the actual decisionmaker, the Second Amended Complaint contains allegations regarding Hernandez's repeated efforts to achieve his goal of having Norris removed from federal employment, including his compiling and sharing a file documenting Norris's alleged misdeeds, his repeated statements regarding his opinions about Norris's 1998 Title VII lawsuit, his expanding

administrative investigations and meetings with FPS supervisors and directors to inform them of Norris's purported misdeeds, which ultimately resulted in Norris's removal from FPS. In addition, the Second Amended Complaint alleges that Reed, the decisionmaker, had knowledge of Norris's protected activity through Morales and the file compiled by Hernandez. Based upon that information, Reed ultimately terminated Norris.

Contrary to Defendant's argument, Plaintiff need not allege more at this stage. Significantly, Defendant cites no law to support the proposition that the Court may, or should, find that the Second Amended Complaint fails to allege causation as a matter of law based upon the facts alleged. Indeed, the cases relied upon by Defendant are of limited utility, as they involve failures to establish causation at summary judgment or trial, are easily distinguishable, or are inapposite. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182-83 (11th Cir. 2010) (discussing causation based on temporal proximity on appeal following a jury trial); *Thomas v. Cooper Lighting, Inc.*, 506 F3d 1361, 1364 (11th Cir. 2007) (discussing causation based on temporal proximity in the context of summary judgment); *Peters v. Harrah's New Orleans*, 418 F. Supp. 2d 843, 850 (E.D. La. 2006) (failure to establish causation upon a cat's paw theory at summary judgment); *Leach v. State Farm Mut. Auto Ins. Co.*, 431 F. App'x 771, 777 n.7 (11th Cir. 2011) (finding insufficient evidence to support cat's paw theory regarding FMLA retaliation at summary judgment); *Hyde v. K.B. Home, Inc.*, 355 F. App'x 266, 273-74 (11th Cir. 2009) (insufficient evidence to support cat's paw theory regarding FMLA retaliation at summary judgment); *Shufeng Zhou v. Genshaft*, No. 8:17-cv-01814-RDP-UAM, 2019 WL 1643230, at *6-7 (M.D. Fla. Apr. 16, 2019) (no facts alleged that would plausibly suggest retaliation in part because plaintiff's own allegations demonstrated that the decisionmakers could not be aware of

plaintiff's complaint as it had not yet occurred when they decided not to reappoint him). As such, the Second Amended Complaint contains sufficient allegations to state a claim for retaliation.

Defendant argues next that if the Court dismisses the Title VII claim, Norris's CSRA claim should be dismissed or transferred to the Federal Circuit. Because the Court does not dismiss the Title VII claim, the Court will not dismiss or transfer the CSRA claim.

### IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [33]**, is **DENIED**. Defendant shall file its answer to the Second Amended Complaint **by January 29, 2021**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 20, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record